UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Taylor Williams,                                                      Case No. 3:22-cv-634

           Plaintiff,

v.                                                         MEMORANDUM OPINION
                                                            AND ORDER

Mercy Health Physicians – North, LLC,

           Defendant.

## I. INTRODUCTION

Defendant Mercy Health Physicians – North, LLC ("MHP"), filed a motion for summary judgment on all claims asserted by Taylor Williams. (Doc. No. 20). After MHP filed its motion, Williams moved to dismiss with prejudice Counts One and Three of her Complaint, which asserted claims under federal and Ohio law for sexual harassment/hostile work environment, (Doc. No. 21), which I granted. (Doc. No. 22). Williams then opposed MHP's motion as to Count Two of her Complaint, which raises a claim for retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a). (Doc. No. 24). MHP filed a brief in reply. (Doc. No. 25). For the reasons stated below, I grant MHP's motion for summary judgment.

## II. BACKGROUND

Williams began working for MHP in August 2020, when Dr. Steven Dood, a physician for whom Williams worked at the time, reached an agreement to join MHP. MHP agreed Dr. Dood could bring several staff members along with him to eventually staff a new MHP office in

Waterville, Ohio. (Doc. No. 16 at 29-30). While renovations of a leased space were finalized, Dr. Dood and Williams worked at a MHP location in Perrysburg, Ohio. The Waterville office opened on November 17, 2020. (Doc. No. 18 at 29). There were three medical providers at the Waterville office – Dr. Dood, Dr. Jeffrey Swartz, and Nurse Practitioner Sarah Wells.

Williams' official job title was Patient Services Coordinator ("PSC"). In this role, she supported the medical providers in the office by "perform[ing] all clerical business functions in a medical office, clinic[,] or ambulatory setting." (Doc. No. 20-7 at 1). These functions included ensuring the computer systems were ready for use by the medical providers, checking in patients prior to appointments and checking them out afterwards, collecting co-pays, scheduling visits, and making reminder calls to patients. (Doc. No. 19 at 29).

When the Waterville office first opened, Williams was the only PSC in the office and her shift ran from 6:45 a.m. to 5:00 p.m., when the office closed for the day. (*Id.*). MHP subsequently hired a second PSC for the Waterville office and created two work schedules for the PSC position. Tonya Rogers, the new PSC, worked from 6:45 a.m. until 2:45 p.m., while Williams worked from 8:30 a.m. to 5:00 p.m. (*Id.* at 69). Rogers was responsible for opening the office and checking patients in and out until Williams arrived. (*Id.* at 69-70).

MHP office staff members primarily were assigned to one office location but occasionally would move, or float, to another MHP office to cover for staffing shortages in that office. Virginia Darr, the office manager at the Waterville location and Williams' supervisor, would receive emailed requests from other MHP offices requesting assistance with staffing shortages. (Doc. No. 19 at 107). Darr evaluated the Waterville office's staffing needs for the day to determine whether a PSC or medical assistants could be spared to assist the other office. (*Id.* at 106-07). Darr recalled that she might float medical assistants several times per month and PSCs more frequently than that. (*Id.* at 107-08).

2

Williams did not float to other offices immediately after the Waterville office opened because, at that time, she was the only PSC assigned to that office. (*Id.* at 116). Once Rogers began working at the Waterville office, Williams was asked to float on several occasions. (*Id.* at 115-17). Darr recalled that she asked Williams to float more often than Rogers, because Rogers "came in before most offices opened, and then she left before most offices closed." (*Id.* at 117). Williams periodically floated to MHP locations in Perrysburg and Oregon, Ohio. (Doc. No. 16 at 70).

MHP has two employee policies which are relevant to this case. The first policy is MHP's attendance policy (the "Attendance Policy"). The Attendance Policy requires employees to report to work on time on scheduled workdays unless they receive their supervisor's approval or they are on an approved leave of absence. (Doc. No. 20-6 at 1). In most instances, violations of the Attendance Policy are subject to a progressive disciplinary procedure. The first step involves a written warning, which an employee will receive for 3 or more "occurrences"[1] within a 90-day period, 5 or more occurrences within a 180-day period, or 8 or more occurrences within a 365-day period. (*Id.* at 2). An employee who receives a written warning begins a 180-day review period. If the employee has 2 or more occurrences within the review period, the employee will receive a final written warning and be subject to a 365-day review period. (*Id.*). Two additional occurrences within the 365-day review period will result in termination. (*Id.*).

The second relevant policy is MHP's conduct policy (the "Conduct Policy"). The Conduct Policy governed employees' work performance as well as their conduct in the workplace and in the community, to the extent that conduct was "illegal or discredit[ed]" MHP. (Doc. No. 20-5 at 2). The first recommended step in the progressive disciplinary process contained in the Conduct Policy

---

[1] An "occurrence" is "[a]n Unscheduled Absence . . . consisting of one or more consecutive full or partial days absent for the same reason or a Tardy greater than or equal to 3 hours . . . ." (Doc. No. 20-6 at 3). The Attendance Policy further defines an Unscheduled Absence as "[a]ny time an associate is scheduled to work and does not report OR does not complete his/her shift." (*Id.* at 2).

3

was verbal feedback, followed by a written warning, a final written warning, and termination. (*Id.* at 1). But the policy also states "[s]ome behaviors and/or performance issues may result in immediate termination," including "[d]ivulging confidential information . . . to unauthorized persons," "theft," "dishonesty," "[f]alsification or unauthorized alteration of Ministry records or documents," and "insubordination." (*Id.* at 1-2).

On March 4, 2021, Darr met with Williams to discuss her work attendance. Between September 21, 2020, and February 24, 2021, Williams had accumulated six Unscheduled Absences, one tardy of more than three hours, and two tardies of less than three hours. (Doc. No. 20-12 at 1). Darr provided Williams with verbal feedback and indicated to Williams that she was in violation of the Attendance Policy. (*Id.*). Darr reminded Williams that she was required to report to work on time on each scheduled workday unless she received her supervisor's approval to take time off or was on an approved leave of absence. (*Id.*).

A few weeks later, on March 31, 2021, around lunchtime, Williams was in the office breakroom. A prescription drug sales representative was in the breakroom, providing free lunches to employees who signed up for one. (Doc. No. 16 at 161). The sale representative was stationed at a counter near the breakroom refrigerator and Williams stood at the counter to sign up for a lunch. (*Id.* at 161-63). Dr. Swartz also was in the breakroom, near the refrigerator. As Williams signed the lunch sign-up sheet, Dr. Swartz walked behind her and whispered in her ear for Williams to sign him up for lunch too. (*Id.* at 168). As he did so, Williams alleges Dr. Swartz's hand brushed against her buttocks. (*Id.* at 165). Williams found the encounter offensive and believed the contact was intentional. (*Id.* at 165-69). She quickly left the breakroom and went to her desk to eat. (*Id.* at 167).

Later the same day, Williams was standing at the nurse's station talking with Dr. Dood. (*Id.* at 170). Williams saw Dr. Swartz walking through the hallway in her direction and she turned away from him. (*Id.* at 171). As Dr. Swartz walked by her, Williams alleges his arm brushed against her

4

breasts. (*Id.* at 170-71). According to Williams, Dr. Swartz continued walking down the hall without saying anything. (*Id.* at 171). Williams stated it did not appear that Dr. Swartz intentionally touched her as he passed by. (*Id.* at 171-72).

Williams did not initially report these incidents because she was in "shock" and was "worried [about] what would happen with [her] job" if she did. (*Id.* at 241). Williams first told her mother and her fiancé before she reported the incidents to Darr on April 12, 2021. (*Id.* at 233). Darr and Williams then called MHP's Human Resources office. (Doc. No. 19 at 77-82). Darr recalls Williams explaining what had happened to someone from Human Resources and that person stating they would begin an investigation. (*Id.* at 79-80). MHP offered to place Williams at another location, but she declined. (Doc. No. 16 at 197-99; Doc. No. 17 at 91).

Jacqueline Forrester, an associate relations manager with the Human Resources office, spoke with Williams and conducted the investigation. (Doc. No. 17 at 50-54). Darr provided Forrester with a list of the employees who were working at the Waterville office on March 31 and Forrester interviewed them by telephone. (*Id.* at 62). Forrester spoke with seven other employees who were working at the Waterville office that day. None of them observed any physical contact between Williams and Dr. Swartz, either in the breakroom or in the hallway. (*See id.* at 86).

Nearly all of the employees indicated they would not be surprised by physical contact between two people in the breakroom, because the room was very cramped. (*See, e.g.,* Doc. No. 20-16 at 2 ("Our lunchroom is small so yes[,] we are packed in there. I would expect contact."); Doc. No. 20-17 ("I would expect contact if someone were trying to pass by me."); Doc. No. 20-20 ("We have a small lunchroom, we are packed in like sardines. I would expect contact if we were passing each other.")). (*See also* Doc. No. 16 at 462 and 468) (photos of breakroom). Forrester was unable to substantiate Williams' allegations because there were no witnesses to the incident, and she

5

recommended that the complaint be closed without the issuance of any corrective action. (Doc. No. 17 at 87).

On April 22, 2021, shortly after the investigation was closed, Dr. Swartz sent an email to Michele Montague, MHP's Chief Operating Officer, and Lindsay Brown, MHP's Director of Operations, summarizing a meeting between the three to discuss Williams' allegations and Dr. Swartz's requests for changes within the office. (Doc. No. 24-1 at 7-8). Dr. Swartz stated "[i]n a way, I feel harassed by this allegation in that all of our workers were asked about my conduct. . . . I will remain cordial with her but will not interact with her except as needed emergently." (*Id.*). Dr. Swartz requested that his nurse, Katie Byers, check patients in and out "whenever possible" and that all of his calls be referred to someone else in the office other than Williams. (*Id.*). He asked Montague and Brown to have Darr and Mallory Horstman, the Regional Practice Administrator responsible for the Waterville office, "to make the necessary changes ASAP." (*Id.* at 8).

Brown had no concerns with Byers checking patients out in the room, noting other providers utilized this procedure. (*Id.* at 7). But Brown expressed reservations about Dr. Swartz's request that Williams not handle his calls. Brown pointed out the logistical difficulties involved because there was "no way to know who is calling and when" and she raised concerns about the impact this might have on patients and the other members of the office. (*Id.*) (noting redirecting calls "would outwardly create more of a division in the office"). Brown stated "we have to expect that professionalism . . . [would] be maintained first and foremost. If it is not[,] then that will be addressed." (*Id.*).

While Williams declined the opportunity to transfer to another office following the March 31 incident, she began to feel anxious about working at the Waterville office. (Doc. No. 16 at 182-83). On May 5, 2021, Williams called off work. Due to her attendance history, (*see* Doc. No. 20-12), Williams' absence led to the creation of a written warning. (Doc. No. 24-1 at 14-15). At this point,

6

the record becomes muddied. Williams remained out of the office until at least May 11, 2021. (Doc. No. 16 at 183). It appears she returned to the office on May 14, 2021, but left early. (Doc. No. 24-1 at 14). On May 17, 2021, Darr informed Human Resources that Williams was placed on a leave of absence, backdated to May 5, and that she did not believe she could deliver the written warning at that time. (*Id.*).

As the month went on, Williams continued to call off work. (Doc. No. 19 at 94-95). Darr cautioned Williams that she needed "to do something or [she was] going to lose [her] job." (*Id.* at 95). At the apparent request of Dr. Dood, who also was Williams' personal physician, Darr corresponded with the MHP department handling leaves of absence, asking that she be told what Dr. Dood "need[ed] to do . . . so that [she could] help this employee with this." (Doc. No. 24-1 at 30).

As Williams' leave of absence neared its end, Forrester and Darr worked to find an alternate placement for her. They arranged for Williams to report to an MHP office in Oregon, Ohio, for a "trial run." (Doc. No. 19 at 228). While Darr reported Williams agreed to the change, (*id.*), Williams subsequently changed her mind and remained at the Waterville office. (Doc. No. 17 at 91).

Williams' leave of absence concluded on May 31, 2021. She called off work the following day before returning to the Waterville office on June 2, 2021. (Doc. No. 24-1 at 37; Doc. No. 16 at 334). That day, Darr gave Williams a written warning for attendance policy violations related to her May 5 absence and informed her that additional violations of the attendance policy could result in further discipline, including termination. (Doc. No. 20-11 at 1-2).

The following morning, Williams texted Darr approximately an hour before her shift was scheduled to begin to say she would be late. (Doc. No. 24-1 at 37). Williams subsequently arrived over three hours after her scheduled start time. (*Id.* at 40). On June 8, 2021, Darr gave Williams a

7

final written warning due to her attendance policy violations on June 1 and June 3. (Doc. No. 20-14 at 1-2).

Later that month, Horstman filled in at the Waterville office while Darr was on a 10-day vacation. On June 22, 2021, Horstman requested that Williams float to a MHP office in Perrysburg, but Williams refused. Williams received a written warning because her refusal to float was considered insubordination. (Doc. No. 20-8 at 1). Horstman delivered the written warning to Williams on June 24, 2021. (Doc. No. 24-1 at 46).

On the same day, Horstman overheard a phone call between Williams and a patient in which Williams told the patient the doctor had no available appointments but that the patient could see Wells, the office's nurse practitioner. (*Id.* at 48). Once the call was finished, Horstman asked Williams about it. Williams reported the patient asked to see Dr. Swartz, but Williams scheduled the patient with Wells because Dr. Swartz's new patient appointments were 60 minutes long. (*Id.*) Horstman pointed out that Dr. Swartz could have "easily accommodated" this patient, who was a direct referral from another patient, because Dr. Swartz had a small number of patients on his schedule and was accepting walk-in appointments. (*Id.*).

Horstman contacted Forrester to request corrective action because Williams was "diverting patients from Dr. Swartz" when "[it] is known to everyone in the [o]ffice that Dr. Swartz will work any patient in . . . requesting to be seen." (*Id.*). Horstman also stated that "[b]ased on review of Dr. Swartz's productivity and him being the lowest generating Provider in the Practice, I have every reason to believe that this is not an isolated incident with [Williams]." (*Id.*) Darr later determined Dr. Swartz had three potential appointment slots for a new patient on June 24, when Williams scheduled the new patients with Wells. (*Id.* at 57).

A few days later, on June 28, 2021, Williams again refused to float to another MHP office. Darr gave Williams a final written warning, noting that additional occurrences could result in termination. (Doc. No. 20-9 at 1-2).

Meanwhile, an investigation was conducted into Horstman's complaint about the June 24 scheduling incident. (*See* Doc. No. 16 at 434-35). The investigation determined Williams violated MHP policies on insubordination and behavior negatively impacting patient care. (*Id.* at 431). On July 7, 2021, Forrester reported to Horstman and Brown that, "[a]fter discussing with [MHP's] legal[ department,] we have landed on a repeat [final written warning] due to the quick succession of issues (everything delivered in the last month)." (Doc. No. 24-1 at 62). Darr gave Williams the final written warning on the same day. (Doc. No. 16 at 431-32).

A few days later, on July 13, 2021, Williams sent an email to the MHP Human Resources department, expressing her belief that the disciplinary actions she received since returning from her leave of absence were the result of retaliation for her allegations against Dr. Swartz. (Doc. No. 20-23). Williams asserted she received a written warning for being absent on days covered by her leave and also stated she should not be required to float to different offices because her supervisors had not demonstrated she had signed any MHP document in which she agreed to float. (*Id.*). Williams testified she did not receive a response to her email. (Doc. No. 16 at 245).

The following week, on July 22, 2021, Williams told Byers she was "bored" and asked if Byers had any work with which Williams could help. (*Id.* at 440-41). Byers told Horstman that Williams was looking for things to do. Horstman then asked Williams to float to an MHP office at St. Vincent's Hospital in Toledo. Williams told Horstman she did not "feel comfortable" going to that office. (*Id.* at 442). Horstman then sent Williams home without pay and informed Williams she would contact Human Resources. (*Id.*). Williams later stated she refused to float to the St. Vincent's office because she had never been to that office and did not like being in Toledo. (*Id.* at 141-42).

9

Williams was terminated the next day for "insubordination, including defiance of a manager or intentional failure to perform assigned work or follow work rules." (Doc. No. 20-4 at 1). She filed suit against MHP on April 20, 2022. (Doc. No. 1).

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. ANALYSIS

Title VII makes it unlawful for an employer to retaliate against an employee who has (1) opposed any unlawful employment practice or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation under either clause, a plaintiff must prove she: "(1) engaged in activity protected by Title VII; (2) the defendant knew of [her] protected activity; (3) thereafter, the defendant took adverse action against the [plaintiff]; and (4) a causal connection existed between the protected activity and the materially adverse action." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (citing *Taylor v. Geithner,* 703 F.3d 328, 336 (6th Cir. 2013)).

If the plaintiff establishes a prima facie case of retaliation, the defendant must meet its burden to produce a legitimate, nondiscriminatory reason for the adverse action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). If the defendant meets this burden, the plaintiff must then present evidence that the defendant's proffered reason is a pretext for retaliation. *Id.* at 515-16.

At all times, the burden of persuasion remains on the plaintiff to establish that her protected activity was the but-for cause of the defendant's actions. In other words, the plaintiff must present "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

MHP contends Williams cannot establish a prima facie case of retaliation and, even if she could do so, MHP had a legitimate, nondiscriminatory reason for terminating her employment. (Doc. No. 20 at 26-31). I conclude Williams has not met her burden with regard to the prima facia case and therefore I need not consider the parties' pretext-related arguments.

MHP does not dispute Williams engaged in protected activity or that it knew of that protected activity. But MHP contends Williams cannot establish a prima facie case of retaliation because she has not identified a materially adverse employment action or established a causal connection between her protected activity and any purported adverse employment action. (*See* Doc. No. 25 at 3-7).

In the retaliation context, a Title VII plaintiff must prove a challenged action was "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations and internal quotation marks omitted). The "reasonable employee" standard is an objective one. *Id.* (emphasis removed).

During her deposition, Williams identified the periodic requirement that she float to different offices as the "sole basis" for her retaliation claim. (Doc. No. 16 at 201-02). Williams

11

argues floating was not one of her primary job duties and that she "experienced the orders to float as a form of harassment." (Doc. No. 24 at 21). But neither of these arguments establishes the floating orders were materially adverse.

First, even if floating was not a requirement of Williams' position, she does not explain how the floating orders might dissuade a reasonable worker from pursing a charge of discrimination. Williams does not dispute that it was not unusual for employees to float between offices and testified that she herself floated without objection on several occasions prior to making her complaint about Dr. Swartz. (Doc. No. 16 at 70). Further, there is no evidence floating had any adverse impact on Williams' pay, her work hours, her commute, or other aspects of her employment.

Second, Williams' belief that MHP ordered her to float in June and July 2021 in retaliation for her complaints about Dr. Swartz is not relevant to this inquiry, as the "reasonable employee" standard does not consider a plaintiff's "subjective feelings." *Burlington N.*, 548 U.S. at 68-69 (emphasis removed).

Williams has not identified any evidence which creates a genuine dispute of material fact as to whether the floating orders constituted a materially adverse employment action. Therefore, MHP is entitled to summary judgment on this basis.

Williams points two other related sets of circumstances as evidence of retaliation – (1) "that Defendant scrutinized her conduct and applied its progressive discipline policy more stringently against her after she complained about Dr. Swartz sexually harassing her" and (2) that her supervisors complied with Dr. Swartz's request that his patients not be sent to Williams to be checked-out after their appointments. (Doc. No. 24 at 18-19).

MHP argues I should not consider these arguments because Williams testified during her deposition that the floating orders constituted the only basis for her retaliation claim. (Doc. No. 25 at 1-2). During her deposition, Williams testified as follows:

> Q. What did anyone from Mercy say or do that was the basis of your retaliation claim, other than the floating?
>
> A. Nothing.
>
> Q. Okay. So the floating is the sole basis of your retaliation claim?
>
> A. Yes.
>
> Q. What facts do you have from personal knowledge that anyone at Mercy said or did anything to lead you to believe that you were being terminated from employment because of your complaints about retaliation for alleging sexual harassment?
>
> A. I'm not sure.

(Doc. No. 16 at 201-02).

But even if I assume Williams has not waived these arguments through her deposition testimony, neither one helps Williams to establish a prima facie case.

Williams summarizes her arguments in this way:

> The supervisors' email communications evidence their desire to terminate Taylor's employment to relieve the doctor's discomfort. The emails, in totality, are direct evidence that (1) Dr. Swartz did not want to work any longer with Taylor because she filed a sexual harassment complaint against him; and (2) Taylor's supervisors appeased him by micro-managing and "nit picking" Taylor so that progressive discipline would result quickly in the end of her employment.

(Doc. No. 24 at 22).

Only Williams' first assertion is true. There is no real dispute that Dr. Swartz attempted to prevent Williams from interacting with him or his patients. (*See, e.g.,* Doc. No. 24-1 at 7) ("I don't feel comfortable with [Williams] taking my calls, screening my patients, [or] checking them in or out."). Brown noted that other MHP providers had their nurses and medical assistants check out patients before leaving the examination room and thought Dr. Swartz could utilize this procedure as well. (*Id.*).

13

But Brown also raised several concerns about Dr. Swartz's request to divert his calls away from Williams and stated it was her expectation that Williams would handle those calls with "professionalism." (*Id.*). Brown later told Darr and Horstman she hoped she could get Dr. Swartz "to move forward. I will continue to push[ ]back on him and I know [Montague] will as well. [We are w]illing to work with him some[,] but if it[']s detrimental to the practice[,] we can't do it." (*Id.* at 9). Both Brown and Montague responded to Dr. Swartz's phone-call-transfer requests by stating their concerns that it could constitute retaliation for Williams' report of her allegations. (*Id.* at 11). Moreover, there is no evidence MHP ever prevented Williams from handling phone calls related to Dr. Swartz's patients.

It is true Williams incurred significantly more disciplinary actions following her allegations against Dr. Swartz than she had received before then. But she has not established a causal connection between the discipline she received and her allegations against Dr. Swartz because she has not identified any evidence which, explicitly or implicitly, establishes that Brown, Horstman, or Darr sought to micromanage Williams to "appease[]" Dr. Swartz following Williams' allegations. (Doc. No. 24 at 22).

Williams reported her allegations against Dr. Swartz on April 12, 2021. Forrester completed her investigation, and Dr. Swartz was notified as to the results of the investigation, no later than April 22, 2021, which was the day Dr. Swartz met with Montague and Brown about Williams' allegations. (*See* Doc. No. 24-1 at 7). Williams first encountered disciplinary action a few weeks later.

In some circumstances, close temporal proximity between protected activity and an adverse action may be sufficient to establish a causal connection between those two events. *See, e.g., Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006); *McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 965 (6th Cir. 2004). But where there is evidence of "an intervening legitimate reason to

14

discipline [an employee], . . . that reason [can] dispel[] an inference of retaliation based on temporal proximity." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) (citation omitted). Here, "[t]he timeline of events . . . extinguishes any inference based on temporal proximity." *Id.*

On May 3, 2021, Williams received documented verbal feedback for a violation of MHP's conduct policy, arising from her refusal to float to another MHP office. (Doc. No. 18 at 107-08, 182). While Williams argues every floating request after the investigation was retaliatory and that there was no evidence that she was required to float before reporting her allegations, (Doc. No. 24 at 23), her deposition testimony contradicts this argument. As I noted above, Williams explicitly acknowledged she floated to MHP offices in Oregon and Perrysburg prior to the alleged incidents with Dr. Swartz. (Doc. No. 16 at 70). And there is no dispute that MHP's conduct policy authorizes the imposition of discipline as a result of insubordination, which includes "defiance of a manager or intentional failure to perform assigned work." (Doc. No. 20-5 at 2). Williams' refusal to follow her supervisor's direction to float to another MHP office is "an intervening legitimate reason to discipline [her], and that reason dispels an inference of retaliation based upon temporal proximity." *Wasek*, 682 F.3d at 472.

Moreover, this was not the only "intervening legitimate reason" dispelling any inference of retaliation. Williams incurred violations of the MHP attendance policy on May 5, June 1, and June 3, 2021. (Doc. Nos. 20-11 and 20-14). While she contends these disciplinary incidents were retaliatory because "neither Darr nor Horstman were particularly concerned about her attendance record" before Williams reported her allegations against Dr. Swartz, (Doc. No. 24 at 22), the evidence again contradicts this argument. A few weeks before her alleged encounters with Dr. Swartz, Darr met with Williams to discuss her lengthy history of attendance policy violations and to inform her that future violations would result in disciplinary actions. (Doc. No. 20-12 at 1). Moreover, Williams has

15

not identified any evidence which might show that the written warnings she received for her attendance policy violations were not justified under the MHP attendance policy.

I conclude there is no genuine dispute of material fact and that MHP has established as a matter of law that Williams's protected activity was not the but-for cause of MHP's actions. Therefore, I grant MHP's motion for summary judgment.

## V. CONCLUSION

For the reasons stated above, I grant MHP's motion for summary judgment as to Williams's sole remaining claim of retaliation in violation of Title VII. (Doc. No. 20).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge